CENTER FOR DISABILITY ACCESS
Raymond Ballister Jr., Esq., SBN 111282
Russell Handy, Esq., SBN 195058
Amanda Seabock, Esq., SBN 289900
Ariel Vento, Esq., SBN 3110708033
8033 Linda Vista Rd, Suite 200
San Diego, CA 92111
(858) 375-7385; (888) 422-5191 fax
arielv@potterhandy.com

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **Andres Gomez**, | **Case**: 3:21-cv-07147-WHA |
| Plaintiff, | |
| v. | **Plaintiff's Opposition to Motion to Dismiss** |
| **Decker Bullock Dreyfus Inc.,** A California Corporation; Gates Estates, Inc.; ; and Does 1-10, | **Date** February 10, 2022 **Time** 8:00 a.m. **Ctrm** 12, 19th Fl. |
| Defendant. | The Honorable Judge William Alsup |

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  Nexus.

Defendant claims that Plaintiff did not allege a nexus between Defendant's website and a place of public accommodation. However, Plaintiff has alleged just that. "The Website is a nexus between Decker Bullock Dreyfus Inc.  customers and the terrestrial based privileges, goods or services offered by "Decker Bullock Dreyfus Inc" Complaint, Dkt. 1, para. 16.  Plaintiff further alleges: "Decker Bullock Dreyfus Inc". offers websites and digital booking as some of the facilities, privileges, and advantages offered by Defendants to patrons of the Real Estate in connection with their patronage at the Real Estate, Complaint, Dkt. 1, para. 14.  Plaintiff alleges that he went to the site as a prospective customer, intent get information about houses on sale in Northern California. Complaint, Dkt. 1, paras. 17-18.  Finally, Plaintiff pleads that when he attempted to navigate the Website, he encountered numerous accessibility design faults that prevented him from navigating the site successfully using SRS. This caused Plaintiff to experience difficulty and confusion navigating the numerous inaccessible elements. As a result of this inaccessibility, he was unable to understand the content and was deterred from further use of the Website. Complaint, Dkt. 1, paras. 20-21.

This more than satisfies the pleading standard to achieve standing. In *Robles v. Domino's Pizza, LLC* 913 F.3d 898 (9th Cir. 2019), the Court rejected the argument that websites are not governed by the ADA, and held the ADA "applies to the services *of* a place of public accommodation, not services *in* a place of public accommodation. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute."*Id*. at 905. The Court also held that the inaccessibility of Domino's

Oppo to MTD                                3:21-cv-07147-WHA

website impedes the access of goods and *services* provided by the chain. *Id*. at 905.

The nexus between the website and the service Defendant provides is critical. Here, the website appears to be an advertisement for its services and it allows persons to gather information about the services provided. The website steers business to the Defendant.

> Domino's website and app facilitate access to the goods and services of a place of public accommodation—Domino's physical restaurants. They are two of the primary (and heavily advertised) means of ordering Domino's products to be picked up at or delivered from Domino's restaurants. We agree with the district court in this case—and the many other district courts that have confronted this issue in similar contexts—that the ADA applies to Domino's website and app, which connect customers to the goods and services of Domino's physical restaurants.

*Id*. at 905-906. The result should be no different here. The services that Defendant promotes and advertises are performed at physical locations that are owned and operated by Defendant. The main way to access Defendant's services is via its website.

Congress enacted the ADA "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). Pursuant to Title III of the ADA, "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodation of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

The Ninth Circuit has explained that the phrase "place of public accommodation" refers to a "physical place." *Weyer v. Twentieth Century Fox Film Corp.,* 198 F.3d 1104, 1114 (9th Cir. 2000). However, "[t]he requirement that a place of public accommodation refer to a physical place...does not preclude a plaintiff from challenging a business' online offerings." *Reed v. CVS Pharmacy, Inc.,* 17-CV-3877, 2017 WL 4457508, at *3 (C.D. Cal. Oct. 3, 2017). "So long as there is a 'nexus' - that is, 'some connection between the good or service complained of and an actual physical place' - a plaintiff may challenge the digital offerings of an otherwise physical business." *Id*. (citing *Weyer*, 198 F.3d at 1114). In other words, the ADA "applies to the services ***of*** a place of public accommodation, not service ***in*** a place of public accommodation. To limit the ADA to discrimination in the provision of services occurring on the premises of a public accommodation would contradict the plain language of the statute." *Id*. (emphasis in original) (citing *Nat'l Fed'n of the Blind v. Target Corp.*, 452 F. Supp. 2d 946, 953 (N.D. Cal. 2006)). This construction was also adopted by the Ninth Circuit in *Robles.* The Department of Justice has "repeatedly affirmed that Title III [of the ADA] applies to websites that meet the definition of public accommodation." *Gorecki v. Hobby Lobby Stores, Inc*., 17-CV-1131, 2017 WL 2957736, at *4 (C.D. Cal. June 15, 2017).

Courts have distinguished between websites that purely have an online presence, such as Facebook or Twitter, and businesses such as the one that is the subject of this matter.

> While the Court acknowledges that a website in and of itself is not a place of public accommodation under the ADA, the Ninth Circuit has distinguished between a stand alone website, and a website that has a nexus to a physical location. For example, Defendant cites to Young v. Facebook, Inc., 790 F. Supp. 2d 1110, 1115, (N.D. Cal. 2011)

for its argument that Defendant's website is not subject to the ADA. However, in <u>Young</u>, the court held that "Facebook operates only in cyberspace, and thus is not a 'place of public accommodation' as construed by the Ninth Circuit." <u>Id.</u> at 1114. The court noted that "[w]hile Facebook's headquarters is obviously a physical space, it is not a place where the online services to which Young claims she was denied access are offered to the public." <u>Id.</u> This is distinguishable from the situation here, where Plaintiffs have demonstrated a nexus between the alleged discrimination on Defendant's website and Defendant's physical place of public accommodation. Under this framework, the Court finds that Title III of the ADA applies to Defendant's website.

*Haggar v. Ashley Furniture Indus., Inc.*, No. LACV1901266 PAJCX, 2019 WL 8886026, at *3 (C.D. Cal. Dec. 12, 2019).

Here, Plaintiff clearly pleads a nexus to a physical location. He pleads that the real estate agency is a "brick and mortar" facility, and that the website offers information about the various services offered. The ADA simply requires that a business provide auxiliary aids to ensure effective communication with the disabled.

"Discrimination" under the ADA encompasses the denial of the opportunity, by the disabled, to participate in programs or services, and providing the disabled with separate, but unequal, goods or services. *See* 42 U.S.C. § 12182(b)(1)(A)(i-iii). To ensure that the disabled have full and equal enjoyment of the goods and services of places of public accommodation, the ADA requires "reasonable modification" of "policies, practices, and procedures," the provision of auxiliary aids to ensure effective communication with the disabled, and the removal of architectural and communications barriers. 42 U.S.C. § 12182(b)(2)(A)(ii-iv). The ADA thus departs from certain anti-discrimination statutes in requiring that places of public accommodation take affirmative steps to accommodate the disabled.

4

*Nat'l Fed'n of the Blind v. Target Corp.,* 452 F. Supp. 2d 946, 951 (N.D. Cal. 2006).

In this day and age, when virtually every business has an online presence, does it make sense that Defendant would be able to offer an inaccessible website to the public?

Defendant argues that the ADA does not cover a website unless the website itself allows a person to purchase goods or services. This is not the law. The *Robles* case specifically did not rule on that point: "We need not decide whether the ADA covers the websites or apps of a physical place of public accommodation where their inaccessibility does not impede access to the goods and services of a physical location*." Robles v. Domino's Pizza, LLC,* 913 F.3d 898, 905 (9th Cir.), <u>cert. denied,</u> (2019).

## II. THE WEBSITE IS A PLACE OF PUBLIC ACCOMMODATION AND INDEPENDENTLY COVERED BY THE AMERICANS WITH DISABILITIES ACT

Defendant's website clearly provides a benefit to its customers. The website is informational and intended to advertise its business. While Defendant dismissively suggests that these are not sufficient to require them to be made accessible, this plainly fails the standards set by the ADA. The question is not whether Mr. Gomez can establish that Defendants conduct **all** of their business in their Brick-and-Mortar office – a Real Estate Agency naturally does not do this as they are often out at showings, etc. - but merely if the website is one of the "goods, services, facilities, privileges, advantages, or accommodations" of a place of public accommodation. 42 U.S.C. § 12182(a).

The defense argues that Plaintiff's claims fail because his Complaint (1) does not establish a connection between the Website and a physical location, and (2) does not plead a "deterrence" or "intent to return" to the

physical location.[1] However, each of Defendant's arguments fail for several reasons. Additionally, Plaintiff can simply amend the complaint to cure any defects, should this court find this necessary.

**A. Contrary to Defendant's suggestion, California does not require a "nexus" to a physical brick and mortar facility.**

No California Court of Appeal has rejected the application of the ADA to a case involving a website. To the contrary, each published decision on the topic has found the ADA to apply and declined to answer hypotheticals outside the question before the court. In *Thurston v. Midvale*, 39 Cal.App.5th 634 (2019), the Cal. Court of Appeal recognized a three-way split between the various federal circuits. Rejecting the narrowest view that no website services are covered, it found that as a service of a place of public accommodation, the site was covered. *Id.* at 644. The court did not decide whether a website disconnected from a physical place would be covered. "[W]e need not consider the wholly hypothetical question whether Title III of the ADA governs a website unconnected to a physical place of public accommodation offering purely Internet-based services or products." *Ibid*. Defendant cites to another subsequent decision, *SDCCU*, to assert the Court of Appeal has taken a position on this issue. This is inaccurate. *SDCCU* also discussed the various approaches that have been taken with respect to the ADA and websites, sorting them from the most restrictive to the broadest applications of the law. *Martinez v. San Diego County Credit Union*, 50 Cal.App.5th 1048, 1062 (2020).

This time, the does not even consider that websites might not be covered by the ADA. *SDCCU*, like the court in *Midvale*, applied the facts and only reached a holding necessary to resolve the case, finding that there was

---

[1] Def. Memorandum., pp. 9-13.

a nexus between the website and the physical place. However, the court did *not* establish a nexus was required. *Id.* at 617. Explicitly rejecting this conclusion, the court explains "we do not reach the legal issue whether the ADA applies to websites even without a nexus to a physical place." *Ibid.*

Contrary to Defendant's suggestion, the application of the ADA to websites is an explicitly open question in California and trial courts interpreting the question have found in favor of plaintiffs on this issue.

***1. The internet is an accessibility tool***

When most people hear the phrase "ADA" it evokes the "International Symbol of Accessibility."



*Figure 1- The ISA logo, depicting a stick figure using a wheelchair has been in use since 1968.*

This image, depicting a stick figure representation of a human being using a wheelchair, is the literal visual representation of "accessibility." This public perception that the ADA is about mobility feeds into one frequent criticism that the ADA over-focuses on mobility disabilities and that other, less visible, disabilities are left excluded. The web is no exception to this. Aside from the wheelchair itself, the internet is likely the greatest accessibility tool to those will mobility limitations in existence. Giving access to markets and information without the need to leave home, the internet is a life changer.

Oppo to MTD                                           3:21-cv-07147-WHA

"People with disabilities have found the internet a real boost because it helps to make life easier by providing online access to services such as banking and food shopping, and also gives them the ability to network with other people who are in the same situation as themselves," he says. "Isolation can be an issue, but the advent of support groups means people can join an online community from the comfort of their own home." – Alex Barker[2]

"To have an opportunity to communicate with others, research information and find entertainment, all from the comfort of your home, makes the internet a true blessing for those with physical limitations," – Jay Cohen, founder of www.disabledonline.com[3]

It's a game changer, that is, assuming you can use it fully. For those without the ability to see, the limitless access to information becomes a barrier itself unless attention is paid to the screen readers. Similarly, for those with hearing disabilities, like Langer, the virtually limitless pool of information is limited. The fastest emerging information mediums online include Youtube and TikTok. What used to exist in written blogs now are frequently moved to video instructionals. Without closed captioning, those that previously relied on the internet for access to information find themselves cut off.

Excluding the internet from the ADA not only undermines the intention of the law to include all people within the economy, but also undermines the internet itself as a bastion of democratized information by limiting only to those able to access it. In 2016, the United Nations passed a resolution recognizing that internet access is a human right.[4] But in California in 2021, we're still arguing whether or not people with disabilities deserve access to those rights.

---

[2] https://www.techradar.com/news/internet/how-the-web-is-improving-the-lives-of-disabled-computer-users-684644.

[3] *Id.*

[4] General Assembly Resolution 38, *The promotion, protection and enjoyment of human rights on the Internet* A/HRC/38/L.10/Rev.1 (4 July 2018)

1    ***2.The ADA applies to websites that interact with interstate commerce.***

2       "Congress enacted the ADA in 1990 to remedy widespread

3    discrimination against disabled individuals." *PGA Tour, Inc. v. Martin*, 532

4    U.S. 661, 674 (2001). As remedial legislation, the Supreme Court instructs

5    that it must be construed broadly to effectuate its purpose. *Tcherepnin v.*

6    *Knight*, 389 U.S. 332, 336 (1967); *Fortyune v. City of Lomita*, 766 F.3d 1098,

7    1101 (9th Cir. 2014). The view advanced by the Defendant dates back to

8    the year 2000. *Weyer v. Twentieth Century Fox Film Corp.*, 198 F.3d 1104

9    (9th Cir. 2000). In the year 2000, the internet as we know it today simply

10   did not exist. Ecommerce was in its infancy. Netflix was a mail-order disc

11   exchange. Amazon had not yet posted a profit. Mark Zuckerberg was in high

12   school. *Peanuts* was still in in daily circulation in *print newspapers*. Mobile

13   phones had just started to take off as a mainstream consumer device, and

14   the iPhone — or smartphones of any kind — didn't exist yet.

15      Put simply, the world that the Ninth Circuit was evaluating with

16   respect to the ADA in 2000 had more in common with the VCR than it does

17   the economy that exists today. This is important, because one of the phrases

18   that was being interpreted in the statute was whether or not the operations

19   of an entity "affect commerce." 42 U.S.C. § 12181(7). What it meant to be a

20   digital "place" was effectively a nonsensical question. In 2000, *Weyer* took

21   a conservative approach to the issue, but the reality of that case was that

22   the website wasn't the type of entities included in § 12182(7)(A)-(L). It was

23   an employee benefits program offered from an employer. *Weyer*, *supra,* 198

24   F.3d 1104. By contrast, a public facing business, such as a landscaping

25   company, is undoubtedly a "service establishment" specifically enumerated

26   by the statute. 42 U.S.C. § 12181(7)(F).

27      The DOJ has taken the position that the ADA applies to the Internet

28   and web-based goods and service providers. *Justice Department Reaches*

9

*Settlement with edX Inc., Provider of Massive Open Online Courses, to Make its Website, Online Platform and Mobile Applications Accessible Under the Americans with Disabilities Act*, DEPT. JUST.: OFF. PUB. AFF. (Apr. 2, 2015), http://www.justice.gov/opa/pr/justice-department-reaches-settlement-edx-inc-provider-massive-open-online-courses-make-its [https://perma.cc/AGU6-V3YZ].[5]

*See, e.g.,* Letter from Deval L. Patrick, Assistant Att'y Gen., to Senator Tom Harkin (Sept. 9, 1996) ("Covered entities under the ADA are **required to provide effective communication**, regardless of whether they generally communicate through print media, audio media, or **computerized media such as the Internet**.")(emphasis added); *Applicability of the Americans with Disabilities Act (ADA) to Private Internet Sites: Hearing before the House Subcommittee on the Constitution of the House Committee on the Judiciary,* 106th Cong., 2d Sess. 65–010 (2000) ("It is the opinion of the Department of Justice currently that the accessibility requirements of the Americans with Disabilities Act **already apply** to private Internet Web sites and services.")(emphasis added); 75 Fed.Reg. 43460–01 (July 6, 2010) ("The Department believes that title III reaches the Web sites of entities that provide goods or services that fall within the 12 categories of 'public accommodations,' as defined by the statute and regulations.").

As seen above, Congress considered amending the ADA to include websites and determined it wasn't necessary, as the original law was expected to keep pace with technology. H.R. Rep. 101–485(II), at 108, 1990

---

[5] The settlement required edX to modify its website, platform, and mobile applications to conform to Web Content Accessibility Guidelines (WCAG) 2.0 AA, industry guidelines for making web content accessible to users with disabilities. *Id.* For a discussion of the guidelines, see *infra* notes 85-106 and accompanying text.

U.S.C.C.A.N. 303, 391 (1990) ("[T]he Committee intends that the types of accommodation and services provided to individuals with disabilities ... should keep pace with the rapidly changing technology of the times."); H.R. Rep. 101–485(II), at 100, 1990 U.S.C.C.A.N. 303, 383 (1990)( "The Committee intends that the 'other similar' terminology should be construed liberally, consistent with the intent of the legislation that people with disabilities should have equal access to the array of establishments that are available to others who do not currently have disabilities.").

Specifically, the original legislative history report notes that an important area of concern is information exchange and although there were "still substantial barriers," that "great strides are being made." *Id; Nat'l Fed'n of the Blind v. Scribd Inc.*, 97 F. Supp. 3d 565, 574 (D. Vt. 2015). "It seems likely that making websites [compliant] is the kind of advanced technology Congress was envisioning." *Ibid.*

### 3.The Ninth Circuit "nexus test" is under significant criticism.

As this case is pending in the Superior Court, it is under no obligation to defer to the Ninth Circuit interpretation of the ADA. Other courts evaluating the Ninth Circuit *Weyer* interpretation have not treated it kindly, and it is unlikely that the decision will continue to age any more gracefully than it has. Indeed, given the multiple competing interpretations, and the serious doubt as to the long-term value of the Ninth Circuit approach, following it is not rational to defer to it when it conflicts with California's individual interest in being at the vanguard of civil rights, given the presence of more appropriate interpretations that provide for protecting civil rights.

"In a society in which business is increasingly conducted online, excluding businesses that sell services through the Internet from the ADA

1    would run afoul of the purposes of the ADA and would severely frustrate

2    Congress's intent that individuals with disabilities fully enjoy the goods,

3    services, privileges and advantages, available indiscriminately to other

4    members of the general public." *Nat'l Ass'n of the Deaf v. Netflix, Inc.*, 869 F.

5    Supp. 2d 196, 200 (D. Mass. 2012) *quoting Carparts Distribution Center, Inc.*

6    *v. Automotive Wholesaler's Ass'n of New England, Inc.¸*37 F.3d 12, 20 (1994).

7          As Representative Nadler put it, when the ADA was enacted:

8          [W]e were not communicating by e-mail, blog, or tweet; we
           were not filling virtual shopping carts with clothes, books,
9          music, and food; we weren't banking, renewing our driver's
           licenses, paying taxes or registering for and taking classes
10         online. Congress could not have foreseen these advances in
           technology. Despite Congress' great cognitive powers, it could
11         not have foreseen these advances in technology which are
           now an integral part of our daily lives. Yet Congress
12         understood that the world around us would change and
           believed that the nondiscrimination mandate contained in the
13         ADA should be broad and flexible enough to keep pace.

14
           *Achieving the Promises of the Americans with Disabilities Act in the*
15
      *Digital Age—Current Issues, Challenges and Opportunities: Hearing before*
16
      *the H. Subcomm. on the Constitution, Civil Rights, and Civil Liberties of the*
17
      *House Comm. on the Judiciary*, 111th Cong., 2d Sess. 111–95 (2010).
18
           One District Court in the First Circuit, calling the approach "absurd"
19
      that business, such as a landscaper that provides services at individual
20
      homes would not be covered under the "nexus" test rejected the argument:
21
22         ADA covers the services 'of' a public accommodation, not
           services "at" or "in" a public accommodation. 42 U.S.C. §
23         12182(a). This distinction is crucial. Consequently, while the
           home is not itself a place of public accommodation, entities
24         that provide services in the home may qualify as place of
           public accommodation. Under Defendant's reading of the
25         statute, many businesses that provide services to a customer's
           home—such as plumbers, pizza delivery services, or moving
26         companies—would be exempt from the ADA. The First Circuit
           held in *Carparts* that such an interpretation is absurd. Under
27         the *Carparts* decision, *the Watch Instantly web site is a place of
           public accommodation and Defendant may not discriminate in*
28         *the provision of the services of that public accommodation—*

---

                                         12

Oppo to MTD                                          3:21-cv-07147-WHA

*streaming video—even if those services are accessed exclusively
in the home.*

Mail order businesses being covered by the ADA is the law of the land in the First Circuit and has been since as early as 1994. *Carparts Distribution Center., Inc. v. Automotive Wholesaler's Ass'n of New England, Inc.,* 37 F.3d. 12, 19-20 (1st Cir. 1994). The Seventh Circuit also follows this sensible approach. *Doe v. Mutual of Omaha Ins. Co.*, 179 F.3d 557, 559 (7th Cir. 1999). The Second Circuit similarly agrees. *Pallozzi v. Allstate Life Ins. Co.*, 198 F.3d 28 (2d Cir. 1999).

At the end of the day, the parties are asking this court to take a position on whether an explicitly discriminatory practice is protected by the law. The law provides a provision to allow the practice to be prohibited, but the Defendant asks this court to read it narrowly to allow discrimination. With virtually endless support, and the specter of history looking back on these other decisions, this court should decline.

### 4. *California, a leader in technology and the crucible for internet innovation, must protect the rights of all its citizens.*

California courts have found no difficulty applying equal access standards to internet services. *Martinez v. Kydia*, MCC1900691 (December 9, 2019)(Minute Order Denying Motion to Dismiss in case based on internet based business, citing to *Thurston* and explicitly rejecting *Robles*); *White v. Square, Inc.*, 7 Cal.5th 1019, 1027 (2019)(plaintiff alleging denial of equal access by a website has standing to sue internet-based business).

The internet economy as we know it calls California home. Silicon Valley is the birthplace of technological innovation. From the electric wheelchair to hearing aids, vaccines, and more, technology has been a boon to those with disabilities, providing access to places, people and things that would have excluded them previously. As noted above, the internet itself is an amazing accessibility tool for those that can use it. However, an

13

1   interpretation of equal access that excludes the fastest growing avenue of

2   access to information and the economy to those with disabilities runs

3   counter to the promise of technology improving access.

4        California cannot simultaneously maintain its position at the

5   vanguard of civil rights guarantees in the country, while courting

6   technology promising to usher us into a modern renaissance unless those

7   technologies are inclusive of all its citizens. The ADA is written in a way,

8   and with a stated intent, that intended to keep up with technology. The

9   courts of California should not interpret it narrowly, in violation of a

10  Supreme Court mandate that remedial statutes be interpreted broadly, and

11  in contravention of California's own stated intention to be on the forefront

12  of civil rights.

13

14  **B. Even under the narrower view, the website is a nexus to Defendant's**

15  **terrestrial business.**

16       Notwithstanding the above, Plaintiff's Complaint <u>does</u> address the

17  "nexus" requirement in *Weyer* and *Robles*. In *Weyer* and *Robles,* the Ninth

18  Circuit held that there must be "some connection between the good or

19  service complained of and an actual physical place." For example, in *Robles*,

20  the court found that "Domino's website and app facilitate access to the

21  goods and services of a place of public accommodation—Domino's physical

22  restaurants." *Robles v. Domino's Pizza, LLC*, 913 F.3d at 905. Therefore, "the

23  ADA applies to Domino's website and app, which connect customers to

24  [Domino's] goods and services." *Id*. at 905-906. The "nexus" test does not

25  ask if the website is itself an independent public accommodation that is

26  also attached to a physical place of public accommodation. *Robles*

27  recognizes that all services *of* a place of public accommodation must be

28  compliant, and if a website is a service of that covered place, it must be

Oppo to MTD                                    3:21-cv-07147-WHA

compliant as well. *Id.* at 905. The nexus test is simply a test of whether the website is such a service.

*Robles* did not contain a subjective qualifier. A nexus exists or it does not. There is no question that all terrestrial business must comply with the ADA. The entire point of the "nexus test" is to decide whether the website is one of the "goods, services, facilities, privileges, advantages, or accommodations" of a place of public accommodation. 42 U.S.C. § 12182(a); *Robles*, 913 F.3d 898 at 906. Here, Defendants do maintain a terrestrial business, and the website is one of its covered benefits:

- Defendants do offer terrestrial services.
- Defendants do conduct business out of the physical place.
- The website does allow customers to obtain information about those terrestrial services.

Defendant claims that plaintiff's ADA claim squarely fails because Defendant has no physical place of public accommodation is false. Not only does Defendant maintain a physical office at the address listed on their website, but they conduct business in the field, like any realtor would. This does not weaken Plaintiff's nexus argument in any way. The Napa Home Team is a place of public accommodation, and their website is one of the services, facilities, advantages, privileges or accommodation of that business by facilitates access to Defendant's physical business and services.

## I.   THE DEFENDANTS' JURISDICTIONAL CHALLENGE IS INAPPROPRIATE AS A 12(B)(1) MOTION

"There is an important difference between Rule 12(b)(1) motions attacking the complaint on its face and those that rely on extrinsic evidence. In ruling on the former, courts must accept the allegations of the

1    complaint as true." *Kohler v. CJP, Ltd.*, 818 F. Supp. 2d 1169, 1172 (C.D.
2    Cal. 2011).

3         Here, the defense has moved for dismissal on the basis that the court
4    lacks subject matter jurisdiction. Dismissal for lack of subject matter
5    jurisdiction in a case premised on federal-question jurisdiction is
6    "exceptional." *Sun Valley Gasoline, Inc. v. Ernst Enter., Inc.*, 711 F.2d 138,
7    140 (9th Cir. 1983).

8         The defense motion to dismiss for lack of jurisdiction is based
9    entirely on the claim that the defendants' website has always complied
10   with the ADA, or is not subject to the ADA, and, therefore, there is nothing
11   for the court to enjoin under the federal statute. While it is appropriate in
12   certain circumstances to bring a motion under Federal Rule of Civil
13   Procedure 12(b)(1) introducing extrinsic facts and challenging federal
14   court jurisdiction, it is not appropriate in the present case with the present
15   motion.

16        The problem with the defendants' motion is that the very question
17   this Court needs to address in determining whether it has jurisdiction is
18   the same question that must be answered to determine the merits of the
19   case and whether plaintiff can prove his claims. Plaintiff alleges that the
20   defendants' website does not comply with state and federal accessibility
21   laws. If that is true, the plaintiff wins and can obtain the injunction. If that
22   is wrong, the plaintiff loses. That is the case. The ultimate question in this
23   case is whether the defendants' website complies with accessibility laws,
24   and is subject to accessibility laws.  The defendant, however, asks this
25   Court to answer that very question in determining whether it has
26   jurisdiction.  This is improper.

27        The Ninth Circuit has cautioned that courts should not apply
28   Federal Rule of Civil Procedure 12(b)(1) or 12(h)(3) when, as it is here,

the issue of jurisdiction is intertwined with the merits of a claim. *See Sun Valley Gasoline*, 711 F.2d at 139-40; *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004); *Robert v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) ("The relatively expansive standards of a 12(b)(1) motion are not appropriate for determining jurisdiction in a case . . . where issues of jurisdiction and substance are intertwined. A court may not resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'") (citation omitted); *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("[I]f the jurisdictional issue and substantive claims are so intertwined that resolution of the jurisdictional question is dependent on factual issues going to the merits, the district court should employ the standard applicable to a motion for summary judgment and grant the motion to dismiss for lack of jurisdiction only if the material jurisdictional facts are not in dispute and the moving party is entitled to prevail as a matter of law . . . . Otherwise, the intertwined jurisdictional facts must be resolved at trial by the trier of fact."); *Rosales v. United States*, 824 F.2d 799, 803 (9th Cir. 1987) ("A district court may hear evidence and make findings of fact necessary to rule on the subject matter jurisdiction question prior to trial, *if the jurisdictional facts are not intertwined with the merits*.").

Where the jurisdictional facts are intertwined with the merits, a Rule 56 "summary judgment standard" applies. *Roberts*, 812 F.2d at 1177; *Careau Grp. v. United Farm Workers of Am., AFL-CIO*, 940 F.2d 1291, 1293 (9th Cir. 1991). The question of jurisdiction and the merits of an action are considered intertwined where the same statute provides the basis for both the subject matter jurisdiction of the federal court and the plaintiff's substantive claim for relief. *Sun Valley*, 711 F.2d at 1138. The

1   defense can and should bring its claims in the form of a Rule 56 motion.[6]
2   Plaintiff also would need to conduct discovery in preparation for a Rule
3   56 motion, including written discovery and depositions, especially a
4   deposition of Elisabeth Bertolucci.

5       Simply put, this Court should not dismiss the action at this juncture
6   because the jurisdictional analysis is coextensive with the merits of
7   Plaintiff's ADA claim and a factual dispute exists as to the alleged
8   corrections.

### II.   Supplemental jurisdiction.

10      Even if the Court dismisses the federal claim, the Court should retain
11  supplemental jurisdiction over Plaintiff's state claim. This is routinely done
12  in ADA cases where the federal claim is mooted. Should federal claims be
13  eliminated in a matter where the court had exercised supplemental
14  jurisdiction, the court should balance the factors of judicial economy,
15  convenience, fairness and comity in determining in determining whether
16  to continue whether to continue to exercise such jurisdiction. *Carnegie-*
17  *Mellon Univ. v. Cohill*, 484 U.S. 343 (1988).

18      Numerous courts have found the exercise of supplemental
19  jurisdiction over state law claims related to an ADA claim proper,
20  emphasizing that the burdens of proof and standards of liability are
21  identical for ADA and Unruh Act claims. *See, e.g., Chapman v. Pier 1 Imports*
22  *(U.S.) Inc.,* 2011 U.S. Dist. LEXIS 93451 at *20 (E.D. Cal. 2011); *Johnson v.*
23  *United Rental Northwest, Inc.,* 2011 U.S. Dist. LEXIS 77027 at *8 (E.D. Cal.

---

[6] Additionally, the Court could convert the motion to a summary judgment
    motion but given the fact that this case is at its earliest stage, discovery
    has not even begun, a summary judgment motion would be premature
    and unfair. Had plaintiff been given notice of a motion for summary
    judgment, he would be in a positon to file a Rule 56(d) request for
    continuance of denial.

2011); *Johnson v. Makinen,* 2009 U.S. Dist. LEXIS 60850 at *7 (E.D. Cal. 2009); *Johnson v. Cala Stevens Creek/Monroe, LLC* 401 F.Supp.3d, 904, 906 (N.D. Cal. 2019); *Johnson v. Rai Rocklin Investments, LLC*, 2017 WL 3421848, *1 (E.D. Cal. 2017); *See also, Lentini v. Cal. Center for the Arts, Escondido,* 370 F.3d 837 (9th Cir. 2004) (upholding district court's award under the Unruh Act without discussion of subject matter jurisdiction.)

## V. Conclusion.

Plaintiff respectfully requests that the Court deny the motion. If, however, the Court is inclined to grant the motion, then Plaintiff request leave to amend.

Dated: December 27, 2021          CENTER FOR DISABILITY ACCESS

By: /s/ Ariel Vento
Ariel Vento, Esq.
Attorneys for Plaintiff

19